*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1430**

In the Matter of the Welfare of the Child of: C. A. P., Parent.

**Filed February 6, 2017
Affirmed
Reilly, Judge**

Hennepin County District Court
File No. 27-JV-16-1631

Mary F. Moriarty, Fourth District Public Defender, David W. Merchant, Assistant Public Defender, Minneapolis, Minnesota (for appellant C.A.P.)

Michael O. Freeman, Hennepin County Attorney, Cory A. Carlson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Michael J. Biglow, Minneapolis, Minnesota (for respondent guardian ad litem)

Considered and decided by Kirk, Presiding Judge; Reilly, Judge; and Bratvold, Judge.

## UNPUBLISHED OPINION

**REILLY**, Judge

Appellant asks us to reverse the termination of her parental rights to her child, arguing that the district court erred in determining that appellant failed to rebut the statutory presumption that she is palpably unfit to parent and in finding that termination of appellant's parental rights is in the best interests of her child. We reject appellant's arguments and affirm.

# FACTS

As relevant to this appeal, appellant C.A.P. has given birth to three children: A.H., born in 2011; K.H., born in 2013; and T.P., born in 2016. On August 8, 2013, A.H. and K.H. were adjudicated children in need of protection or services (CHIPS) because their "behavior, condition, or environment [wa]s such as to be injurious or dangerous to [them] or others." *See* Minn. Stat. § 260C.007, subd. 6 (2012) (defining "[c]hild in need of protection or services)." The CHIPS order incorporated C.A.P.'s admission of "ongoing violence" with R.H., the adjudicated father of A.H. and K.H. Specifically, C.A.P. admitted that "[R.H.] has physically abused both [A.H. and K.H.] and choked her on at least one occasion in the presence of [A.H. and K.H.]." The CHIPS order also set forth C.A.P.'s case plan, which required her to, among other things,

> [p]articipate in domestic abuse programming and follow all recommendations; . . . [c]omplete a parenting assessment and follow all recommendations; . . . [m]aintain and cooperate with Order for Protection against [R.H.]; . . . [m]aintain safe and suitable housing, free of any domestic or physical violence; . . . [and] [c]ooperate with child protection social worker.

To implement that case plan, respondent Hennepin County Human Services and Public Health Department (the county) provided C.A.P. with services including a parenting assessment and parenting education, domestic-violence programming, and individual therapy. C.A.P. accepted and participated in the offered services; successfully completed the parenting assessment, parenting education, and domestic-violence programming; obtained an order for protection (OFP) against R.H. and reported having no contact with

2

R.H.; and otherwise appeared to fully comply with her case plan. In actuality, C.A.P. continued to have contact with R.H., and at some point R.H. and C.A.P. began cohabitating.

Unaware of R.H.'s presence in C.A.P.'s home and believing C.A.P. to be in compliance with her case plan, the county resolved the child-protection matter and returned A.H. and K.H. to C.A.P.'s care in or around April 2014. On December 9 of the same year, in the presence of C.A.P. and three-year-old A.H., R.H. repeatedly punched two-year-old K.H. in the chest, killing him.[1] Immediately following K.H.'s murder, A.H. was found to have scars, "significant scabbing and bruising," and other evidence of physical abuse, neglect, and malnutrition. Three days after K.H.'s murder, the county petitioned for involuntary termination of C.A.P.'s parental rights to A.H.

On April 27, 2015, following a trial, C.A.P.'s parental rights to A.H. were terminated on the statutory ground that A.H. and K.H. suffered egregious harm in C.A.P.'s care. In support of its egregious-harm finding, the district court found:

> [C.A.P.] knew of the grave danger both [A.H. and K.H.] were in if [R.H.] was allowed access to them. . . . Though she was all too aware of the danger posed by [R.H.], [C.A.P.] ignored it and defied the OFP, choosing instead to allow [R.H.] back into her home to reside with her and [A.H. and K.H.]. Subsequently, [A.H.] was abused, neglected, and maltreated, and [K.H.] was killed.

And in support of its finding that termination of C.A.P.'s parental rights was in A.H.'s best interests, the court found:

---

[1] On January 15, 2015, R.H. was convicted of the second-degree murder of K.H. and sentenced to 480 months' imprisonment.

[C.A.P.] has been provided services to address domestic violence, but she ultimately could not make a good decision for [A.H. and K.H.], instead continuing her relationship with [R.H.] and allowing him access to [A.H. and K.H.] even before her prior child protection case closed. She has demonstrated that she cannot make decisions to protect her children and keep them even minimally safe.

We affirmed this termination of parental rights (TPR) on November 9, 2015. *In re Welfare of Child of C.A.P.*, No. A15-0940, 2015 WL 6830202, at \*1 (Minn. App. Nov. 9, 2015).

Meanwhile, C.A.P. had a sexual relationship with L.T., whom she had "met . . . online to ask for prayer" in or around May of 2015, and later determined that she was pregnant with T.P. in or around June of 2015. C.A.P. subsequently learned that L.T. was married, had served time in prison for burglary, and had "a domestic violence past." C.A.P. sought and received prenatal care and, about midway through her pregnancy, moved from a homeless shelter to an "on-site housing program" that provides social services. C.A.P. participated in services offered by the housing program, including goal setting, safety planning, and parenting education, and she prepared for T.P.'s birth by obtaining items such as furniture, clothing, and baby supplies.

When T.P. was one day old, T.P. was placed on a hospital hold due to C.A.P.'s prior TPR. C.A.P. declined to identify T.P.'s father to a county child-protection investigator; C.A.P. instead informed the investigator that "[T.P.]'s conception had been the result of a fling" and that "[T.P.]'s father was not going to be involved." The county then petitioned for involuntary termination of C.A.P.'s parental rights to T.P., alleging the statutory grounds that C.A.P. "has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon [her] by the parent and child relationship" and that

4

C.A.P. "is palpably unfit to be a party to the parent and child relationship." *See* Minn. Stat. § 260C.301, subd. 1(b) (2016) (listing statutory grounds for involuntary TPR). On March 24, C.A.P. identified T.P.'s father as L.T. Thereafter, C.A.P. sought individual therapy to address "issues of domestic violence" and related issues.

The district court conducted a trial on the 2016 TPR petition on June 21 and 29, 2016. At trial, the county first introduced evidence including the 2013 CHIPS order; the 2015 TPR order; and the testimony of the county child-protection investigator, the county social worker assigned to the prior child-protection matter, and the county social worker assigned to the current child-protection matter. C.A.P. then introduced evidence including medical records regarding her pregnancy with, and delivery and postpartum care of, T.P.; written statements from C.A.P.'s therapy providers; C.A.P.'s own testimony; and the testimony of two employees of the housing program, a hospital social worker, and one of C.A.P.'s therapy providers. Finally, the court heard testimony from T.P.'s guardian ad litem (GAL), who also had served as the GAL for A.H. and K.H. in the prior child-protection matter.

In July 2016, the district court filed its findings of fact, conclusions of law, and order terminating C.A.P.'s parental rights to T.P. on the sole statutory ground of palpable unfitness to parent. The court denied C.A.P.'s subsequent motion for a new trial and/or amended findings. C.A.P. now appeals.

**D E C I S I O N**

"[A]n involuntary termination of parental rights is proper only when at least one statutory ground for termination is supported by clear and convincing evidence *and* the

termination is in the child's best interest." *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 137 (Minn. 2014). Statutory grounds for termination include:

> that a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn. Stat. § 260C.301, subd. 1(b)(4) (2016).

## I.

Ordinarily, "[a] natural parent is presumed to be suitable to be entrusted with the care of his child and it is in the best interest of a child to be in the custody of his natural parent." *R.D.L.*, 853 N.W.2d at 136 (quotation omitted).

> When, however, the government has, in an initial proceeding, overcome that presumption of fitness through clear and convincing evidence that a parent cannot be entrusted to care for his or her children, [a] statutory presumption of unfitness . . . relieves the government of its burden to again overcome the natural parent's presumption of fitness . . . .

*Id.* (citation omitted). That is, "[i]t is presumed that a parent is palpably unfit to be a party to the parent and child relationship upon a showing that the parent's parental rights to one or more other children were involuntarily terminated." Minn. Stat. § 260C.301, subd. 1(b)(4).

"This presumption is a rebuttable presumption." *In re Welfare of Child of J.W.*, 807 N.W.2d 441, 445 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). "The statutory presumption imposes on a parent the burden of going forward with evidence to rebut or

meet the presumption." *Id.* (quotations omitted). This presumption "does not shift to a parent the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast"—here, the county. *Id.* (quotation omitted). Instead, "the statutory presumption shifts to a parent a burden of production." *Id.*

"[T]o satisfy the burden of production and thereby rebut the presumption created by section 260C.301, subdivision 1(b)(4), a parent must introduce evidence that would justify a finding of fact that he or she is not palpably unfit." *Id.* (quotation omitted); *see also R.D.L.*, 853 N.W.2d at 137 (expressly endorsing this language as "the appropriate standard"). "This standard . . . is a much lower bar than the clear and convincing standard shouldered by the County," because "the parent needs to produce only enough evidence to support a finding that the parent is suitable to be entrusted with the care of the child[]." *R.D.L.*, 853 N.W.2d at 137 (quotations omitted). If a parent meets this burden of production, the statutory presumption is rebutted and has "no further role" in the TPR proceeding; "[t]he burden of persuasion remains with the county to prove, by clear and convincing evidence, that specific conditions existing at the time of the hearing make [the parent] palpably unfit to be a parent." *J.W.*, 807 N.W.2d at 447 (quotation omitted).

"Whether a parent's evidence satisfies the burden of production must be determined on a case-by-case basis." *Id.* at 446; *see also R.D.L.*, 853 N.W.2d at 137. In determining whether a parent's evidence would justify a finding that she is not palpably unfit, a court should credit and consider the evidence without weighing it against any contrary evidence. *See J.W.*, 807 N.W.2d at 443-44, 446-47 (summarizing parent's evidence "that she has

7

changed in significant and material ways since the prior TPR proceedings," reasoning that "[t]his evidence, if believed, would justify a finding contrary to the assumed fact that [parent] is palpably unfit," and concluding that parent rebutted statutory presumption of unfitness, notwithstanding introduction of contrary evidence by county and GAL and cross-examination of parent's witnesses "that tended to limit the effect of their testimony" (quotation omitted)). Therefore, when, in a proceeding to terminate parental rights, a district court has addressed whether a parent has introduced sufficient evidence to rebut the statutory presumption of unfitness arising from a prior termination, appellate courts review that ruling de novo. *See id.* at 446 ("We apply a *de novo* standard of review to a district court's determination as to whether a parent's evidence is capable of justifying a finding in his or her favor at trial.").

In this case, C.A.P. argues that the district court's palpable-unfitness finding was based on an erroneous determination that C.A.P. failed to rebut the statutory presumption of unfitness.[2] In support of her argument, C.A.P. points to statements in the 2016 TPR order that she has "failed to meet her burden of rebutting the presumption" and "has not rebutted the presumption of palpable unfitness." C.A.P. then recounts the evidence that she introduced at the trial on the 2016 TPR petition and urges us to conclude that her evidence is sufficient to rebut the presumption. But we need not determine whether C.A.P.'s evidence is sufficient to rebut the presumption of unfitness to parent, because our

---

[2] In neither her proposed findings of fact and conclusions of law nor her motion for a new trial and/or amended findings of fact did C.A.P. ask the district court to rule that her production of evidence at trial rebutted the statutory presumption of palpable unfitness.

close review of the 2016 TPR order and the surrounding record leads us to conclude that, whether or not the district court believed that C.A.P. failed to rebut the *presumption* that she was a palpably unfit parent, it unambiguously determined that C.A.P. was, *in fact*, a palpably unfit parent.

Before finding that C.A.P. is palpably unfit to parent, the district court expressly found "credible in all respects" the county's witnesses' testimony that C.A.P. does not hold herself accountable for what happened to A.H. and K.H., "is able to mask issues going on in life," and "can complete tasks without gaining insight." The court credited the GAL's testimony that "she sees no changes in [C.A.P.'s] behaviors" and that C.A.P. "enters unsafe situations" and "can[no]t put her children's needs above her own." By contrast, the court expressly found C.A.P.'s testimony that "she has internalized the lessons from the last case," that "her mindset is different from the past case," and that "she is able to exercise better judgment" not credible, noting that C.A.P.'s "demeanor on the stand was that of someone who had not truly improved her judgment or ability to be a fit parent."

The district court also found that C.A.P. "did not provide full candor to service providers, the [county,] or the [GAL] regarding [T.P.'s father]." And the court found that C.A.P. "had a more extensive period of engagement with [L.T.]" than she had acknowledged, expressing concern about "the manner in which [C.A.P.] began and continued a relationship with [L.T.]" Relatedly, the court found that C.A.P.'s "judgment regarding her own safety has not improved." Finally, the court found that C.A.P. "continues to be untruthful with service providers, puts her needs above her children's needs, and makes statements that merely reflect what she believes others want to hear."

9

The above credibility and fact findings are supported by record evidence and are not relevant to a parent's burden to produce evidence which, "*if believed*, would justify a finding contrary to the assumed fact" of parental unfitness. *J.W.*, 807 N.W.2d at 447 (emphasis added) (quotation omitted). What is more, these findings support the district court's conclusion that "[t]here is clear and convincing evidence that [C.A.P.'s] parental rights should be terminated under Minn. Stat. § 260C.301, subd. 1(b)(4), as [C.A.P.] is palpably unfit to be a [party] to the parent and child relationship." We therefore are confident that the district court held the county to a burden of proof by clear and convincing evidence that C.A.P. is, in fact, palpably unfit to parent and did not rely on the statutory presumption in making its palpable-unfitness finding, notwithstanding its two statements that C.A.P. failed to rebut the presumption.[3] *Cf. id.* ("Having rested its decision on the statutory presumption, the district court did not make any findings or conclusions as to whether the county satisfied its burden of persuasion on the issue of palpable unfitness."). We reject C.A.P.'s argument to the contrary and do not disturb the district court's finding of palpable unfitness.

---

[3] We reiterate that whether a parent has met her burden of *production* to rebut a *presumption* of palpable unfitness and whether the county has met its burden of *persuasion* regarding whether a parent is, *in fact*, a palpably unfit parent, are legally distinct questions. *J.W.*, 807 N.W.2d at 447. A district court answers the former question by crediting the parent's evidence and, without weighing it against any contrary evidence, considering whether that evidence could show the parent to be able to parent the child. A district court answers the latter question by evaluating the credibility and probability of all the evidence. *See id.* at 443-44, 446-47. As the above analysis demonstrates, a district court need not determine whether a parent has met her burden of production if the county has met its burden of persuasion. But we caution against any false equation, in form or in substance, between a parent's failure to rebut the statutory presumption and a county's success in meeting its burden of persuasion.

## II.

In any TPR proceeding, "the best interests of the child must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2016). Accordingly, "termination based solely on a statutory presumption is improper. The juvenile court also must independently find in each case, even with a presumption of unfitness, that termination is in the child's best interests." *R.D.L.*, 853 N.W.2d at 137.

The best-interests analysis "consists of weighing three primary factors: the child's interest in maintaining the parent-child relationship, the [parent's] interest in maintaining the parent-child relationship, and any competing interest of the child." *In re Welfare of Children of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013). "Determination of a child's best interests is generally not susceptible to an appellate court's global review of a record, because of the credibility determinations involved, and because of the multiple factors that must be weighed." *Id.* (quotation omitted). Thus, a district court's findings as to a child's best interests are reviewed for clear error. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 387 (Minn. 2008).

A finding is not clearly erroneous unless "it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). In our review of the evidentiary support for a district court's findings as to a child's best interests, we must not make our own factual findings; "[f]or the court of appeals to make factual findings such as these is to overstep the bounds of its role as a reviewing court." *S.E.P.*, 744 N.W.2d at 387.

11

In this case, the district court expressly found that "the evidence presented by [C.A.P.] in describing how she will keep [T.P.] safe is not credible" and further found that "[C.A.P.] continues to demonstrate a lack of awareness of the changes needed to protect [T.P.]." The court credited the GAL's testimony that "nothing has changed since the [prior child-protection matter], including [C.A.P.'s] decisions with regard to relationships, her lack of truthfulness or providing complete information to providers, and her ability to provide the information people want to hear without really showing that she has internalized beneficial material she received." The court accordingly found that C.A.P. "continues to be unable to keep her child safe from volatile relationships" and, reasoning that "[T.P.]'s safety is absolutely vital to the determination of his best interests," found that TPR is in T.P.'s best interests.

On appeal, C.A.P. argues that the district court's best-interests findings are clearly erroneous "because they are not reasonably supported by the evidence as a whole." Essentially, C.A.P. asks us to ignore the district court's credibility findings, reweigh the body of evidence, and make new findings of fact. We decline C.A.P.'s request, as we must. *S.E.P.*, 744 N.W.2d at 387. On the record before us, and particularly in light of the district court's express credibility findings, we conclude that the challenged best-interest findings are not clearly erroneous.

C.A.P. also argues that the district court "erred in its best interests analysis, as a matter of law, because it placed undue emphasis on [C.A.P.]'s prior [TPR] and past conduct, rather than what she had done to change since that tragic time in her life." C.A.P. is correct that "[a] decision to terminate parental rights must be based on the conditions

that exist at the time of termination" and that "[w]hen considering petitions to terminate parental rights, a district court should rely not primarily on past history, but to a great extent upon the projected permanency of the parent's inability to care for his or her child." *J.W.*, 807 N.W.2d at 446 (quotations omitted). But C.A.P.'s argument here ignores the district court's findings that C.A.P. has not truly changed since she failed to protect A.H. and K.H. from egregious harm and murder, and that she therefore continues to be unable to adequately protect her children. Because these findings are not clearly erroneous, the district court did not err in determining that termination of C.A.P.'s parental rights is in T.P.'s best interests.

**Affirmed.**