*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1868**

In the Matter of the Welfare of the Children of: M. O., Parent

**Filed April 11, 2016
Affirmed
Smith, Tracy, Judge**

Ramsey County District Court
File No. 62-JV-14-2324

Nicole S. Gronneberg, St. Paul, Minnesota (for appellant mother M.O.)

John J. Choi, Ramsey County Attorney, Kathryn M. Eilers, Assistant County Attorney, St. Paul, Minnesota (for respondent Ramsey County)

Thomas J. Nolan, Jr., St. Paul, Minnesota (for guardian ad litem Ruby Payne)

Considered and decided by Reyes, Presiding Judge; Ross, Judge; and Smith, Tracy, Judge.

## UNPUBLISHED OPINION

**SMITH, TRACY**, Judge

Appellant-mother M.O. challenges the district court's termination of her parental rights. Because the district court did not abuse its discretion by concluding that there is a statutory ground for termination and that termination is in the best interests of the children, we affirm.

# FACTS

M.O. is the mother of nine children, including the six-year-old twin boys (the boys) who are involved in this appeal.[1]  M.O. is considered a vulnerable adult, and has a developmental disability case manager, a semi-independent living services worker, and a representative payee who pays her rent and bills.  Although M.O. received child-protection services on and off for over 15 years, none of M.O.'s other children remain in her custody.  Two children were transferred to the custody of their father, one child was ordered to long-term foster care, and two other children were transferred to the custody of other relatives.  The other children are adults.

The boys were born while Ramsey County Community Human Services Department (RCCHSD) had an open case regarding several other of M.O.'s children.  The boys remained with M.O. because she was sober at the time, was not in an abusive relationship, had stable housing, and was cooperating with programming.

On October 17, 2013, police officers visited M.O.'s home after receiving a tip that the boys had been physically abused.  The officers observed broken glass and feces stains on the carpet and bed sheets and found the boys, then three years old, without diapers and covered in feces.  M.O. provided a preliminary breath test (PBT) that showed an alcohol concentration of 0.248.  The officers later determined that a man present in M.O.'s home had an active no-contact order prohibiting contact with M.O.  The officers removed the boys from M.O.'s home and placed them on a 72-hour protective hold.  Three days later,

---

[1] We note that the record is unclear regarding whether M.O. has eight or nine children. The boys' father's parental rights were terminated in November 2014 and are not at issue in this appeal.

M.O. provided a PBT that showed an alcohol concentration of 0.304. M.O. was later evicted and was homeless for approximately five months.

The district court adjudicated the boys as children in need of protection or services (CHIPS) and granted RCCHSD temporary custody of the boys. When the boys were removed from M.O.'s home, they lacked self-help skills, were not developmentally on track, and had immediate dental needs. The boys had their top teeth extracted and needed 8 and 12 cavities filled, respectively. The boys also required speech and behavioral therapy.

RCCHSD developed a case plan for M.O. that identified family needs, including parenting skills, domestic violence, and chemical health. RCCSHD provided parenting-skills and chemical-dependency services to M.O. M.O. was discharged from inpatient chemical-dependency treatment in February 2014. But the parenting-skills services were extended three times because M.O. struggled to demonstrate effective parenting skills. During her supervised visits with the boys, M.O. used poor strategies to direct the boys' behavior, did not safely supervise the boys or manage their aggression toward her or each other, and did not attend to the boys' physical or emotional needs. An RCCHSD case worker explained that M.O. lacked insight into the boys' needs, could not follow through, and played with the boys as a "peer" or "friend," rather than as a parent. RCCHSD reduced the length of M.O.'s visits with the boys because the boys' behavior "deteriorat[ed] rapidly" if the visits lasted over one hour.

Because M.O. was not making progress with her parenting skills, her service providers requested a parenting assessment. The psychologist who conducted the

assessment determined that M.O. was unable to meet the boys' needs or maintain their safety, that she could not set limits, communicate expectations, or follow through on discipline, and that she modeled aggressive behaviors with the boys. The psychologist concluded that the boys "could be at physical or emotional risk" if they were returned to M.O.'s home.

After the boys had been away from M.O.'s home for almost 11 months, Ramsey County petitioned to terminate M.O.'s parental rights. At trial, M.O. asserted for the first time that RCCHSD's services were not reasonable because she understands "very little" English and the language barrier prevented her from understanding her service providers. M.O. immigrated to the United States in 1995. Her native language is Anuak, and she received no English language training before moving to the United States. M.O. admitted talking to her various case workers, the boys' foster parents, her attorney, people in Alcoholics Anonymous meetings, and the boys in English and understanding them. During the trial, M.O. started answering questions in English before her interpreter finished translating the questions. M.O. agreed that she is successful in communicating with others even though there is a language barrier.

Ramsey County introduced evidence from M.O.'s case workers that M.O. was able to communicate orally in English. According to an RCCHSD report, M.O. does not read or write English but "does appear to have a basic command of the English language in both speaking and understanding what is said." An RCCHSD case worker testified that she worked on "very simple goals" with M.O. and asked M.O. "to repeat back to me what she understood about the goal." The worker testified that at first it was difficult to

4

understand what M.O. was saying but that the worker "revise[d] the way [she] spoke to her and listen[ed] very carefully to what [M.O.] was saying." The worker never used an interpreter to speak with M.O. and had no reason to believe that M.O. could not understand her. A different case worker testified that she and M.O. "would go back and forth and would state the same [thing] in different ways and give examples that applied to the situation at hand." She also testified that M.O. "responded appropriately" to her questions. Similarly, the guardian ad litem testified that in her many years of working with M.O., "there's never been a barrier as far as understanding by [M.O.]. She's never indicated she didn't understand." M.O. was able to communicate with others in English for the ten years that the guardian ad litem was involved with her.

Finally, the psychologist who conducted M.O.'s parenting assessment testified that M.O. indicated she did not need an interpreter at the evaluation because she "felt that she understood enough English." The psychologist testified that she intentionally made questions simpler for M.O. and rephrased them to make sure M.O. understood them. The psychologist believed M.O. could understand enough English to complete the evaluation. Based on her interaction with M.O. and her contacts with other individuals familiar with M.O., the psychologist determined that M.O. needed an interpreter only for reading English, not for speaking it.

Following eight days of trial, the district court terminated M.O.'s parental rights to the boys. The district court concluded that four statutory grounds for termination were met and that termination of M.O.'s parental rights is in the boys' best interests.

M.O. appealed.

## DECISION

A district court may terminate parental rights if "at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the child's best interests." *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). We review the district court's findings of fact for clear error and "its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). Although we defer to the district court's decision to terminate parental rights, "we closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).

A finding is clearly erroneous if it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). We will not set aside a finding "unless our review of the entire record leaves us with a definite and firm conviction that a mistake has been made." *In re Welfare of D.T.J.*, 554 N.W.2d 104, 107 (Minn. App. 1996) (quotation omitted).

## I.

M.O.'s main argument on appeal is that the district court clearly erred by finding that RCCHSD made reasonable efforts to rehabilitate her and reunite her with the boys. In every proceeding to terminate parental rights, the district court must make "specific findings" that the county made reasonable efforts to rehabilitate the parent and to reunite

6

the family.  Minn. Stat. § 260C.301, subd. 8 (2014).  M.O. argues that RCCHSD failed to provide reasonable efforts because it "failed to formally assess [her] language abilities and failed to provide her with any interpreter services to assist her in working with service providers."

"When determining whether reasonable efforts have been made," the district court must consider "whether services to the child and family were:  (1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances."  Minn. Stat. § 260.012(h) (2014).  "Reasonable efforts at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance."  *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotations omitted), *review denied* (Minn. Mar. 28, 2007).

M.O. first argues that the district court clearly erred by finding that she "is able to verbally communicate in English."  The evidence supports a finding that M.O. can communicate orally in English.  Service providers who had worked with M.O. for approximately thirteen years orally communicated with M.O. in English.  The guardian ad litem for the boys and others of M.O.'s children testified that she had been communicating effectively with M.O. in English for ten years and that M.O. never gave her any indication that M.O. did not understand her service providers.  Child-protection workers also testified that they communicated effectively with M.O. in English.  M.O. acknowledged orally communicating with her various case workers, the foster parents, her attorney, people in Alcoholics Anonymous, and the boys in English.  M.O. never

7

raised a language issue at her previous CHIPS or permanency cases. The district court's finding that M.O. can communicate orally in English is not clearly erroneous.

M.O. also argues that, even if she understood some English, RCCHSD was required to assess her language skills and to provide her with an interpreter. But given M.O.'s 15-year history of speaking to service providers in English, RCCHSD did not have a reason to formally assess M.O.'s English abilities before providing her services in this case. M.O. had never previously indicated a problem understanding her service providers and did not object to the reasonableness of her services until trial.

M.O. argues that reasonable efforts required the provision of an interpreter because she also has a low I.Q. and the condition requiring correction—parenting skills—was complicated and abstract. Indeed, the record suggests that M.O.'s parenting problems were tied more to her intellectual abilities than her English-speaking ability. One service provider explained that M.O. "has a disability whether she speaks English or not." M.O. argues that her case is similar to *T.R.*, in which service providers failed to account for the parent's "lack of verbal skills and low average I.Q." *See* 750 N.W.2d at 659. M.O.'s service providers, however, specifically accounted for M.O.'s intellectual limitations, as well as her English limitations. The psychologist made questions simpler for M.O. and rephrased them to make sure M.O. understood. One case worker "revise[d] the way [she] spoke to [M.O.]," worked on "very simple goals" with her, and asked M.O. "to repeat back to [her] what she understood about the goal." Another case worker stated that she and M.O. "would go back and forth and would state the same [thing] in different ways and give examples that applied to the situation at hand." The child-protection

8

workers who worked with M.O. had experience working with parents who had cognitive deficits and for whom English is a second language. The record supports the district court's determination that RCCHSD tailored its services to M.O.'s abilities. This case is unlike *T.R.*

At the time of termination, RCCHSD had provided almost two years of parenting-skills services to M.O. and had extended these services three times because M.O. had not shown improvement in her parenting skills. These services were in addition to the parenting-skills services RCCHSD had provided during M.O.'s previous involvements with child services. RCCHSD also provided chemical-dependency services, which M.O. appears to have successfully completed. We conclude that the record supports the district court's determination that the services were relevant and adequate to address M.O.'s and the boys' needs, culturally appropriate, accessible, consistent, and realistic under the circumstances. *See* Minn. Stat. § 260.012(h). The district court therefore did not clearly err by concluding that RCCHSD provided reasonable services to rehabilitate M.O. and to reunite the family. *See id.*

## II.

Minn. Stat. § 260C.301, subd. 1(b) (2014) sets forth nine statutory grounds for termination of parental rights. The district court found that four of those grounds were met here:

(1)     M.O. failed to comply with her duties under the parent and child relationship under subdivision 1(b)(2);

(2)     M.O. "is palpably unfit to be a party to the parent and child relationship" under subdivision 1(b)(4);

(3)     reasonable efforts have failed to correct the conditions leading to the boys' out-of-home placement under subdivision 1(b)(5); and

(4)     the boys are neglected and in foster care under subdivision 1(b)(8).

To affirm the district court's termination of parental rights, only one of these statutory grounds needs to be supported by clear and convincing evidence. *See R.W.*, 678 N.W.2d at 55. Because M.O.'s main argument concerns RCCHSD's reasonable efforts, we analyze the district court's finding that reasonable efforts have failed to correct the conditions leading to out-of-home placement.

A statutory basis for terminating parental rights exists under section 260C.301, subdivision 1(b)(5), when "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement" out of the home. The district court found that conditions that led to the boys' out-of-home placement had not been corrected, despite RCCHSD's reasonable efforts. The primary condition remaining uncorrected was M.O.'s lack of parenting skills, which would place the boys' health, safety, and welfare at risk should they be returned to M.O.'s care. M.O. does not directly challenge the court's findings with respect to the deficiencies in her parenting skills, but mainly asserts that RCCHSD failed to provide reasonable efforts to help M.O. improve her parenting. As stated above, the district court did not clearly err by finding that RCCHSD provided reasonable efforts to M.O.

10

Nor did the district court clearly err in finding that conditions that led to the boys' out-of-home placement were not corrected. *See* Minn. Stat. § 260C.301, subd. 1(b)(5). The conditions that led to the boys' out-of-home placement included M.O.'s drinking, unstable housing, decision to allow a man into her home even though she had a no-contact order against him, and lack of parenting skills. M.O. did correct some of these conditions. She maintained housing and sobriety for over a year and was not involved in an abusive relationship. But M.O. has a history of returning to "old habits" once Ramsey County completes a child-protection matter. In addition, complying with aspects of the case plan alone does not create a presumption that the conditions that led to the out-of-home placement have been corrected. *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 667 (Minn. App. 2012).

Importantly, after years of services, M.O. was unable to correct her lack of parenting skills. Several service providers described M.O.'s lack of progress. The psychologist determined that M.O. could not identify the boys' individual needs, could not consistently apply consequences, and could not apply limits or follow through with them. When M.O. played with the boys, they became aggressive and M.O. did not intervene. M.O. was often inattentive to the boys, choosing to play with toys independently and leaving safety issues to other adults observing the visits. M.O. struggled to engage with the boys over even an hour-long visit, and longer visits were stopped to prevent a deterioration in the boys' behavior. The record supports the district court's finding that "[M.O.'s] parenting skills have not improved." Despite M.O.'s love for the boys and RCCHSD's reasonable efforts, M.O. has failed to correct the most

11

important condition leading to the out-of-home placement—her inability to parent the boys.

The district court's findings that RCCHSD provided reasonable efforts to M.O. and that M.O. failed to correct the conditions that led to the boys' out-of-home placement are supported by clear and convincing evidence in the record. Therefore, the district court did not abuse its discretion by determining that the statutory ground for termination under subdivision 1(b)(5) exists here. Because we conclude that one ground for termination exists, we need not analyze the other grounds found by the district court. *See R.W.*, 678 N.W.2d at 55.

**III.**

After a determination that one of the statutory grounds for termination of parental rights has been met, "the best interests of the child must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2014). "In analyzing the best interests of the child, the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). The child's competing interests include "a stable environment, health considerations and the child's preferences." *Id.* "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7. We review a determination that termination is in a child's best interests for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 905.

12

The district court found that M.O. had an interest in preserving the parent-child relationship but that the boys did not. Specifically, the district court found that the boys "do not have an interest in preserving the parent and child relationship with [M.O.], because [M.O.] does not have the skills to adequately parent [the boys.]" M.O. challenges this finding, arguing that she does not have the skills to adequately parent the boys because RCCHSD failed to provide her with reasonable assistance. But again, RCCHSD's efforts were reasonable.

The district court found that the boys need "a safe, stable home," need to have their physical, mental, and emotional needs met "on a daily and consistent basis," and need "structure, consistency, and permanency." The district court also found that M.O. cannot satisfy any of those needs. The record supports these findings. One case worker, the psychologist, and the guardian ad litem all testified that M.O. cannot meet the boys' needs and recommended terminating M.O.'s parental rights. The boys have benefited from their stable out-of-home placement, including regular health care and therapeutic services. In addition, the boys have a strong interest in obtaining permanency. *See In re Welfare of J.R., Jr.,* 655 N.W.2d 1, 5 (Minn. 2003) ("Each delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home and can seriously affect a child's chance for permanent placement.").

Because the record supports the district court's findings, the district court did not abuse its discretion by determining that the termination of M.O.'s parental rights is in the boys' best interests.

**Affirmed.**

13